Filed 1/19/22  P. v. Casillas CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>SALVADOR CASILLAS, JR.,<br><br>        Defendant and Appellant. | A162338<br><br>(Solano County<br>Super. Ct. No. FCR345030) |

Defendant Salvador Casillas, Jr. appeals from his sentencing on the ground that the trial court failed to order a supplemental probation report before imposing sentence.  Finding no prejudice, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with two felony counts of stalking (Pen. Code,[1] § 646.9, subd. (b)), 18 misdemeanor counts of disobeying a domestic relations court order (§ 273.6, subd. (a)), two misdemeanor counts of making annoying phone calls (§ 653m, subd. (b)), and one misdemeanor count of battery (§ 243, subd. (e)(1)).  The alleged victim was his former girlfriend, G.K.

---

[1] All statutory references are to the Penal Code.

1

Defendant entered a plea of no contest to one count of felony stalking, with a maximum sentence of four years in state prison.[2]  The remaining counts were dismissed with a *Harvey*[3] waiver, and no promises were made as to the sentence.

Sentencing was initially scheduled for February 3, 2020, but was continued multiple times, first due to defense counsel's motion to withdraw (which was granted) and, later, at the requests of new defense counsel. Defendant was eventually sentenced on February 26, 2021 to the midterm of three years in state prison.

*The Underlying Offenses*

We draw the essential facts of the offense from the probation presentence report prepared in early February 2020.

G.K. ended a three-year relationship with defendant, moving to a location with her elderly mother that she believed defendant could not find. She feared for her safety after ongoing incidents of domestic violence throughout her relationship with defendant.  Defendant then "continuously harassed" her with "pervasive" phone calls.  He used tracking technology to track her whereabouts, and "identity hiding applications" on the phone he used to harass her.

---

[2] There were two felony counts of stalking.  Count 1 alleged that between April 7 through April 23, 2019, defendant "did willfully, maliciously, and repeatedly follow and did willfully and maliciously harass G.K., and made a credible threat with the intent that she be placed in reasonable fear for her safety and the safety of her immediate family," and that defendant was "subject to a temporary restraining order, injunction and other court order prohibiting the above described behavior against G.K."  Count 2 alleged the same conduct, but for the earlier period between March 1, 2019 and April 6, 2019, and when there was no court order.

[3] *People v. Harvey* (1979) 25 Cal.3d 754.

On March 26, 2019, G.K. met with defendant, because he said that if she would see him, he would agree to end their relationship. When G.K. arrived, defendant was " 'acting extremely weird.' " He told her he needed to make a phone call and briefly left the vehicle where he and G.K. had been sitting and having a conversation. Moments later, Rio Vista police arrived, with sirens and lights. Defendant jumped out of the vehicle and yelled that G.K. was holding him at gunpoint in the vehicle, causing the police to place G.K. under arrest. His allegation against G.K. was unsubstantiated, and no charges were filed against her. G.K. later told police she knew then that she had been "set . . . up" by defendant.

On April 2, 2019, defendant and G.K. each filed for temporary restraining orders; only G.K.'s was granted. Even though his temporary restraining order had been denied, defendant tried to "serve" the denied order on G.K. in a further effort to harass her.

Although defendant was served in person on April 7, 2019, with the restraining order issued by the court to protect G.K., he did not stop contacting G.K. or her mother, who was also protected under the court order.

On April 10, 2019, G.K. informed police that defendant was violating the restraining order. She indicated that as of that date he had harassed her "at least 150 times by continuously calling and texting her mother's cell phone." G.K. was so afraid that she slept with her clothes on and armed with a firearm, and had hired a security detail to escort her to and from court. Between April 11 and April 21 alone, G.K. reported at least 250 missed calls and text messages from defendant to her mother's phone.[4]

---

[4] These contacts in violation of the restraining order included the following: on April 13, defendant sent text messages to a person "connected" to G.K. with a picture of the front of her residence and derogatory names; on April 14, there was a text message to G.K.'s mother's phone stating "come out

On April 23, 2019, G.K.'s mother heard a strange noise outside in the middle of the night; she looked through the blinds and saw flames coming from the side of the garage. A witness reported that defendant's son was "lurking around the complex sometime before the fire was set."

Later on in the morning of April 23, defendant was arrested at Family Court where he had been ordered to appear.

Defendant told police G.K. was "crazy" and "lying to him." He stated, "'I love [G.K.] What she did was wrong. She cannot just walk out on me like that. It has to do with the way she went about it. If [G.K.] would have told me, 'Fuck you, I am leaving,' it would have been a different story. She planned this since November. She used me and fucked me. None of it meant anything." He blamed G.K. He admitted he had his son try to serve the temporary restraining order that had been denied. He denied making calls to G.K. or that he had access to license plate technology. He denied calling G.K. on April 21. He accused G.K. of having mental health issues and "repeatedly denied harassing" her.

On April 23, defendant's residence was searched pursuant to a warrant, and officers found the phone used to make the harassing calls and text messages described above.

---

now, and wtf"; on April 15, a text message stating "no pay day"; on April 17, text messages to her mother's phone stating, "bitch, I sorry, text back and I'll stop by" and "hey"; on April 21, several text messages to her mother's phone stating "I want you back," and "I need you." G.K. answered one phone call and recognized defendant's voice saying "miss you," "sorry" and crying throughout the call.

## DISCUSSION

Defendant contends on appeal that the court erred in failing to order and consider a supplemental probation report before sentencing him on February 26, 2021, and that he was prejudiced as a result.

A.   *The Trial Court Erred in Not Ordering a Supplemental Report*

Section 1203, subd. (b)(1) requires, with exceptions not applicable here, that if a person is convicted of a felony and eligible for probation, before judgment is pronounced the court shall "immediately refer the matter to a probation officer to investigate and report to the court, at a specific time, upon the circumstances surrounding the crime and the prior history and record of the person, which may be considered either in aggravation or mitigation of the punishment."

California Rules of Court, rule 4.411(a)(2)[5] requires a "supplemental report if a significant period of time has passed since the original report was prepared." The Advisory Committee Comment to rule 4.411 states: "Subdivision (a)(2) is based on case law that generally requires a supplemental report if the defendant is to be resentenced a significant time after the original sentencing, as, for example, after a remand by an appellate court, or after the apprehension of a defendant who failed to appear at sentencing. The rule is not intended to expand on the requirements of those cases." The Advisory Committee comment continues that "The rule does not require a new investigation and report if a recent report is available and can be incorporated by reference and there is no indication of changed circumstances. This is particularly true if a report is needed only for the Department of Corrections and Rehabilitation because the defendant has

---

[5] All further references to rules are to the California Rules of Court.

5

waived a report and agreed to a prison sentence. If a full report was prepared in another case in the same or another jurisdiction within the preceding six months, during which time the defendant was in custody, and that report is available to the Department of Corrections and Rehabilitation, it is unlikely that a new investigation is needed." Therefore, we look to case law to determine what constitutes a "significant period of time" requiring a supplemental report.

At least one court has concluded that a "period of more than six months may constitute a significant period of time." (*People v. Dobbins* (2005) 127 Cal.App.4th 176, 179-181 (*Dobbins*).) In *Dobbins*, there was an eight-month delay between the original probation report (which resulted in defendant being sentenced to probation) and the subsequent sentencing hearing at which the court found defendant violated probation, revoked probation, and imposed a previously suspended 16-month sentence. For two of those months after the initial sentencing, Dobbins had been out of custody. The Court of Appeal in *Dobbins* concluded that on these facts the trial court erred by not ordering a supplemental or updated report. (*Id*. at p. 181.)

Here, defendant was out of custody during the year his sentencing was continued. The Attorney General has not offered any justification for the trial court's failure in not ordering and reviewing an updated report. We can find no justification in the record and conclude that it was error.

B.    *Reversal is Not Warranted Because There is No Prejudice*

A trial court's error in failing to order a supplemental report is a state law error only, and thus our review is governed by the *Watson* standard of harmless error. (*Dobbins*, *supra*, 127 Cal.App.4th at p. 182, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) That means that we will not reverse the judgment unless defendant establishes there is a reasonable probability he

6

would have obtained a more favorable result if a supplemental report had been prepared.  (*Dobbins, supra,* at p. 182.)

1.    The Presentence Report

Considering the "criteria affecting probation," under rule 4.414, the probation officer observed that "[t]he nature, seriousness, and circumstances of the crime as compared to other instances of the same crime appear significantly elevated in seriousness given the large number of violations of the Court's orders in addition to the sustained and pervasive harassment." The probation officer "also noted that during these events, [defendant] utilized the Rio Vista Police in March 2019 to escalate the harassment of the victim."  Additionally, the presentence report concluded that defendant "inflicted significant emotional injury upon the victim."

In considering circumstances in aggravation under rule 4.421(b), the probation officer stated that "defendant has engaged in violent conduct that indicates a serious danger to society."  The presentence report continued: "The defendant's behavior throughout this series of events associated with the instant offense is egregious and indicative of a substantial public safety concern.  Though he has a limited history of criminal conduct, it is noted that his one prior was for domestic violence, demonstrating a pattern of family violence related behavior that has apparently gone undetected and/or unreported."[6]  Further, "[w]hen confronted about his behavior, [defendant] largely minimized his role in the events leading up to his arrest and maintained his narrative that the victim pulled a gun on him in Rio Vista."

---

[6] The probation officer was referring to a "misdemeanor conviction for domestic violence over fifteen years ago," for which there was "no record of probation performance" given the age of the conviction.

The report continued, "It is that the defendant has a limited history of criminal conduct that probation appears even *remotely* reasonable in this matter. It is also noted that it appears the defendant has not attempted to contact the victim since the date of his arrest on 4/23/19. *Nonetheless, a recommendation for imprisonment was heavily considered and would be justifiable.* Given the highly marginal nature of appropriateness, it will be a highly guarded recommendation for probation with significant restrictions and a lengthy probationary period. . . ." (Italics added.)

   2.     The Sentencing Hearing

At the sentencing hearing on February 26, 2021, the court heard from the victims. G.K. and her mother provided written statements. In her victim impact statement, G.K.'s mother described the toll defendant's conduct had taken on her "mentally, emotionally, physically, financially and socially," as well as G.K.'s mother having to experience the "worst nightmare for a mother is not being able to help her child in a situation that is beyond her control." G.K. appeared at the sentencing hearing and spoke at length about how defendant's actions had affected her. She described being in a relationship with defendant that was "very manipulative, very controlling." She explained: "I would tell him often, I don't belong here. And he would tell me you're not going anywhere. I tried to get out . . . because I begged him, leave me alone, and he wouldn't. That's what he said, I promise you, I give you my word, you will never hear from me, you will never see me again, just meet me for five minutes. I was so desperate at that point for him to leave me alone." Describing what ensued when she agreed to meet with defendant, G.K. told the court, "And then . . . everything else happened. He set me up. He lied. . . . It was just horrible. It totally destroyed my world, my professional world, my personal, my family, everything. [¶] I cannot reiterate what it's like to be

8

the victim of a stalker.  I have hired [an attorney]. . . . [A]fter [defendant] had me arrested, he called me crying, saying, I am so, so sorry.  I'm so sorry, crying.  Then he texts and said, what can I do to clean this mess up.  When I wasn't answering, that's when I became the enemy.  That's when I because the focus of his stalking and his anger."

G.K. told the court that she was "terrified."  "We had to move a few times.  I'm away from my family.  I don't get to see them.  I don't get to see friends.  I still look over my shoulder."  G.K. told the court that defendant has "changed me as a person.  Before I was confident, happy; now I'm not like that anymore."

G.K.'s written victim witness statement contained detailed recitals of what she experienced, how her life was affected, and the fear defendant's conduct caused her on a daily basis.  She described her two-year "plan" to "escape" from defendant, and his relentless conduct directed toward her before and after she obtained a temporary restraining order.  She described defendant calling "my job my director my corporate office," her daughter, her special needs grandson, her daughter's 92-year-old great grandmother, her brother who she hadn't spoken to in years.  At one point he was calling and texting her "close to a hundred times a day."  He was "texting pictures of my front door 'saying I'm 10 feet away' 'it's time to come outside.' "  She implored the court, "Imagine receiving threats like this a hundred times a day.  This put me in panic mode.  Fight or flight.  Hypervigilant.  I was not sleeping or eating.  I had friends drive around to make sure I could go outside safely."  She concluded her written statement, "There are no words to truly explain the torment that the Defendant has caused to myself and my family.  It will be a lifetime of counseling and courage to heal."

At sentencing, the district attorney argued for the maximum sentence of four years in state prison.

Defense counsel argued for probation. About one month prior to sentencing, defense counsel filed a Mitigation Statement.[7] In this submission, defense counsel noted that this was defendant's first felony conviction, and his only other conviction was a misdemeanor from "some 17 years prior," "for which he completed court probation." Defense counsel also stated that defendant had "abided by all court orders since arrest."

At the sentencing hearing, defense counsel also addressed the court. She reiterated that while the criminal case was pending, defendant had not stalked G.K. She emphasized defendant's various obligations to his family, his health status, and his employment.

But defense counsel's comments also made clear that defendant continued to deny some aspects of his conduct. Counsel attached as an exhibit to the Mitigation Statement defendant's application for temporary restraining order against G.K., filed April 2, 2019, the very application the superior court denied in favor of issuing a temporary restraining order protecting G.K. and her mother. In response to a question on the application form asking "[w]hat other orders are you asking for," defendant responded, *"[f]or [G.K.] to do jail time for the crimes she has done to me."* (Italics added.)

Defendant's son spoke on behalf of his father at the sentencing hearing, stating that his father was a "great man" and a "real great guy," and asked for leniency.

After hearing from the parties and the victims, the court stated that it had "read these reports a number of times, and considered what's in them,

---

[7] One of the continuances in defendant's sentencing date was based on his counsel's desire to have additional time to prepare this statement.

which includes the statements from [G.K.] and her mother, includes the defendant's statement, where he asks the Court to grant probation, indicating that he's the sole provider in his home, and that he's got medical issues, talks about his future plans. So I've looked at all of that, considered what both lawyers have said today."

The court then said it was denying probation "because of the seriousness of the offense as outlined in this case as related to me by [G.K.], what I know about this offense. I just don't think [defendant will] be successful on probation."

The court sentenced defendant to the midterm of three years in state prison, explaining, "The mitigating factors that I've taken into your account are the defendant's health situation, his lack of a serious criminal history, and the impact of imprisonment on him.

"However there are circumstances in aggravation, including the conduct of the defendant in the offense, which I find to be serious, indicating the danger to society and to the victim in this case.

"And based on that, I find the aggravating and mitigating factors balance each other out, which is why I've chosen the midterm of three years."

### 3. There was No Prejudice

Defendant contends he was prejudiced because of "[t]wo harms" that flowed from the trial court's error. First, a supplemental probation report "likely would have provided evidence confirming defense counsel's argument" that defendant had not made any attempt to contact the victims in the year since the report was written, and that "affirmation" would have made it "reasonably likely . . . [to] have persuaded the court to grant probation or at least impose the low term of imprisonment." Second, the original report did not provide any "details or guidance" concerning defendant's "performance on

11

a grant of probation years before." Defendant speculates, "Assuming appellant successfully completed his one grant of probation," this factor was "reasonably likely to persuade the trial court to impose the low-term" of imprisonment (2 years) rather than the midterm.

Neither argument is persuasive.

As to the first alleged harm, no one—not the victims, not the prosecutor—ever contested at the sentencing hearing or otherwise defense counsel's report that defendant had not contacted the victims in the year since the original presentence report was prepared. Defense counsel mentioned defendant's non-contact with G.K. in the Mitigation Statement, and stated it again at sentencing. In short, this fact was not kept from the court. And even had this apparent fact been stated in a supplemental probation report, in addition to in defendant's own uncontested statements, it is not reasonably probable that it would have made a difference in the sentencing.

As to defendant's second "harm"—the asserted lack of information about the grant of probation "years before"—this was not the result of the trial court's error in not requesting an updated presentence report. The reference to a grant of misdemeanor probation in 2003 was in the *original* presentence report, and the probation officer noted at the time of its preparation that records were unavailable due to the age of the conviction. Defendant amplified in his Mitigation Statement that this was "court" probation, which we take to mean not supervised by the probation office, and no one contested that assertion, either. Nor is the argument persuasive. It is a stretch to see how defendant's conduct on a court probation sentence in a 17-year-old misdemeanor conviction so remote that the probation officer did not find it to be an aggravating factor for this sentence, makes it reasonably

12

probable that the trial court would have reduced the sentence here. Regardless how defendant conducted himself on probation on the misdemeanor, he committed even more serious conduct in felony stalking G.K. 17 years later. In addition, the underlying fact of the misdemeanor conviction itself (leaving aside how defendant performed on court probation) did not figure much in the judge's sentencing decision here; if anything, the court found defendant's "*lack* of a serious criminal history" to be a mitigating factor. (Italics added.)

In sum, the court was aware of all of the arguments that might militate in favor of a lesser sentence or probation, and defendant has failed to show prejudice from the failure to order a supplemental presentence report.

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Richman, Acting P.J.


_____
Kline, J.*


A162338, *People v. Casillas*

_____

&ast; Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14